CURTIS JILES *VS.* DEPARTMENT OF CORRECTION & others.[1]

No. 00-P-820.

Suffolk. February 15, 2002. - August 26, 2002.

Present: JACOBS, KASS, & BERRY, JJ.

*Imprisonment,* Access to courts.

On a complaint brought by an inmate alleging that the defendants, the Department of Correction and certain of its officers, unconstitutionally interfered with his right of access to the courts because the security measures in place in an interview room at a correctional facility did not adequately preserve the confidentiality of his communications with counsel, the trial court judge properly entered summary judgment in favor of the defendants, where the plaintiff failed to demonstrate that the security measures, which were reasonably related to penological interests, caused him to suffer an actual injury that hindered his court access [661-664]; further, the trial judge properly entered summary judgment in favor of the defendants on the plaintiff's additional claims, which alleged violations of the Federal [664] and State [664-665] civil rights acts and his statutory right to access to attorney visitation under G. L. c. 127, § 36A [665-666], where such claims were based on his underlying unsuccessful constitutional claim.

An inmate at a correctional facility failed to demonstrate that the Department of Correction and certain of its officers had deprived him of his right to counsel at a "critical stage" of the criminal process, in violation of the Federal and State Constitutions. [665]

CIVIL ACTION commenced in the Superior Court Department on March 19, 1999.

The case was heard by *Patrick J. King,* J., on a motion for summary judgment.

*David Radner* for the plaintiff.

*Richard C. McFarland* for the defendants.

BERRY, J. The plaintiff, Curtis Jiles, filed a complaint alleging

---

[1]Michael T. Maloney, individually and in his official capacity as the Commissioner of Correction, and John J. Marshall, Jr., individually and in his official capacity as superintendent of the Massachusetts Correctional Institution at Cedar Junction.

that the Department of Correction (department) and certain of its officers unconstitutionally interfered with his right to legal representation because the conditions of an interview room in the west wing segregation unit (WWSU) of the Massachusetts Correctional Institution at Cedar Junction (Cedar Junction) did not adequately preserve the confidentiality of his communications with counsel. Thereby, Jiles claims, there were violations of his constitutional and statutory rights to counsel and to access to the courts, under both the Federal and Massachusetts civil rights acts, and under G. L. c. 127, § 36A.[2] The trial court allowed the defendants' motion for summary judgment on all counts. We affirm.

1. *Background facts.* From February 28, 1999, to May 24, 1999, Jiles was held in the WWSU. The WWSU is an "awaiting action" unit for inmates who are charged with disciplinary offenses. Jiles was transferred to the WWSU because of disciplinary charges pending against him for an assault on a correctional officer, disruptive conduct, and the use of obscene and threatening language.

In the WWSU interview room, an inmate and counsel can confer in circumstances where both the inmate and the lawyer are physically present in the same part of the room — sometimes called a contact setting.[3] This setting allows for the exchange of papers. The room has a solid door, but there is an open grille in a part of the door. Because of a past history of prisoner disruption in the correctional facility, a guard remains stationed approximately eight to ten feet outside the door. As

---

[2]Many of the nine counts of the complaint have overlapping claims and repetitious allegations. The nine counts may be briefly summarized as follows: count I (interference with State and Federal constitutional rights of access to the courts); counts IV and VII (violation of State and Federal constitutional rights to counsel, and attorney visitation access under G. L. c. 127, § 36A); and counts II, III, V, VI, VIII, and IX (violations of the Massachusetts Civil Rights Act [MCRA], G. L. c. 12, § 11I, and the Federal Civil Rights Act, 42 U.S.C. § 1983, predicated upon rights of access to the courts and to counsel, and upon G. L. c. 127, § 36A).

[3]Since August, 1995, social visits have been noncontact visits because of increased violence and drug use at Cedar Junction. Thus, the provision of contact visits between an inmate and his attorney differs from general visitor access, which is limited to telephone communication or separation of the inmate and the visitor by a barrier.

will become clear, it is the open grille in the door and the guard's presence outside the door that are the focal points of the plaintiff's claims.

One March 9, 1999, meeting is at the core of the claims alleged in the complaint. In fact, this March 9 meeting was the only time Jiles met with his lawyer in the challenged WWSU interview room prior to the filing of his complaint. See note 4, *infra*, and accompanying text. During the meeting, his lawyer, Laura Malouf, told the guard posted outside the door that she felt restricted in conversing with Jiles. She expressed her opinion that the guard was standing too close in the exterior space beyond the door and might overhear their conversations through the open grille. Malouf requested relocation to another interview room. That request was granted. Jiles and Malouf were then moved to another interview room where they could communicate by telephone. Malouf complained again, stating that the volume of the telephone was too low and that because of ambient noise, she and Jiles were unable to communicate unless they raised their voices. Malouf requested that she be allowed to move behind the glass partition to the other side of the telephone room where Jiles was seated. This request was denied because of security concerns, including that the room's physical layout would obstruct the guard's view of such a meeting. Jiles and Malouf were then given the option of returning to the WWSU room in which their meeting had originated. They declined to do so.

Two days later, on March 11, Malouf wrote to the superintendent objecting to the conditions in the WWSU interview room. The superintendent wrote back the same day, explaining that no other visiting accommodations existed in the WWSU and that a guard was required to be posted outside of the interview room for security reasons and to ensure personal safety. The superintendent stated that no special alterations in the interview forum or protocol would be instituted for Jiles. In fact, the practice of stationing a guard outside of the WWSU interview room had been in effect since 1995, and prior to Jiles' complaint, there had been no other complaints that the interview room setting or the guard's presence interfered with or impeded consultations with counsel.

The next day, on March 12, Malouf filed, and the department approved, a request to meet with Jiles that night. The department noted that the meeting would be held in the regular WWSU interview room, but that the guard would be directed to stay away from the door as far as possible, giving Jiles and Malouf a "wide berth." Malouf did not come to the institution to see Jiles for the requested March 12 meeting and, prior to filing the complaint, made no further requests beyond the one just described. There were postcomplaint meetings, all of which took place in the WWSU interview room.[4] Because these latter meetings are referenced in the summary judgment pleadings, we have considered them. The issue, however, is placed in factual context by the first meeting, and we need not dwell on the details of the postcomplaint meetings. It suffices to state that Jiles and Malouf continued to complain about having meetings in the interview room with a guard posted outside.

2. *Analysis of these claims.* We address each of Jiles's claims in the pertinent counts, and the grant of summary judgment thereon.[5]

a. *Count I: Right of access to the courts.* Jiles's claim in count I is predicated upon an inmate's constitutional right of access to the courts. We conclude that summary judgment was properly entered on this count because Jiles has not demonstrated that he suffered an actual injury that hindered court access, a

---

[4]Additional postcomplaint meetings with counsel occurred on March 25, 1999, April 13, 1999, and April 29, 1999.

[5]The defendants filed a motion to dismiss the appeal as moot because, on May 24, 1999, Jiles was transferred from the WWSU to the disciplinary detention unit, following a guilty finding on the disciplinary charges. A release from a challenged condition of confinement, including a transfer to a different prison unit, does not render a case moot where the complaint includes claims of constitutional and statutory violations under the Federal and State civil rights acts, and where the complaint, in addition to injunctive and declaratory relief, also includes, as here, a demand for damages. See *Watts* v. *Commissioner of Correction,* 42 Mass. App. Ct. 951, 953 (1997); *Pidge* v. *Superintendent, Mass. Correctional Inst., Cedar Junction,* 32 Mass. App. Ct. 14, 21-22 (1992). Cf. *Schaer* v. *Brandeis Univ.,* 432 Mass. 474, 475 n.2 (2000) (in context of complaint alleging, inter alia, civil rights violations, court found "appeal is not moot because there are claims of money damages"). In light of this determination, we need not reach the plaintiff's other contention that the case is not moot because it involves a recurring question over which appellate review is not obtainable. See generally *Lockhart* v. *Attorney Gen.,* 390 Mass. 780, 782-784 & n.4 (1984).

requisite element of such a claim. "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program [or a similar pertinent institutional condition] is subpar in some theoretical sense." *Lewis* v. *Casey*, 518 U.S. 343, 351 (1996). Constitutional case law preserving prisoner rights to mount legal challenges "guarantees no particular methodology but rather the conferral of a capability — the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356. The actual injury that must be established by an inmate is that an actionable claim involving a challenge to a sentence or to conditions of confinement "has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided." *Ibid.* Jiles did not meet this burden. While " '[m]eaningful access' to the courts is the touchstone," *Bounds* v. *Smith*, 430 U.S. 817, 823 (1977) (citation omitted), the States are not required to "guarantee inmates the wherewithal to transform themselves into litigating engines . . . . The tools [that the constitutional right of access to the courts] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis* v. *Casey*, 518 U.S. at 355. See generally *Puleio* v. *Commissioner of Correction*, 52 Mass. App. Ct. 302, 311-312 (2001).

In this case, the record establishes that Jiles was sufficiently able to communicate with counsel in March, 1999, such that he was able to file this complaint on March 19, challenging one condition of his confinement involving the interview room and meetings with counsel. Indeed, throughout the period of his WWSU confinement, Jiles had the opportunity to meet with counsel every day. To this end, a department regulation provided for in-person meetings with counsel between 9:00 A.M. and 8:30 P.M. See 103 Code Mass. Regs. § 486.08 (1993). In connection with such attorney conferences, Jiles has not demonstrated that the posting of a guard outside the door unconstitutionally impeded his ability to confer with counsel or hindered his access to the courts. For example, among other things, Jiles's pleadings do not address the mundane, but real, issue of why

lowered voices would not have allowed for confidential attorney-client communications and assuaged concerns about the guard overhearing. In addition, there were other means available for Jiles to communicate confidentially with counsel. These other means included telephone access and the exchange of letters through the confidential medium of a locked mail box available in the WWSU.

The overarching constitutional challenges alleged in the complaint, in many respects, seem more an objection to the confines of the WWSU interview and the posting of a guard outside. But an inmate has no constitutional right to dictate security protocol at a correctional facility, or where security officers should be posted. "The commissioner has substantial obligations to 'maintain security, safety and order at all state correctional facilities' (G. L. c. 124, § 1[b] [1984 ed.]) and to regulate visits to such facilities (G. L. c. 127, § 36 [1984 ed.])." *Hoffer* v. *Commissioner of Correction*, 397 Mass. 152, 155 (1986). According to department regulations, WWSU status "may include more restrictive confinement as deemed appropriate by the Superintendent or his designee." 103 Code Mass. Regs. § 430.21 (1993). A prison regulation, even if it interferes with a prisoner's constitutional rights, "is valid if it is reasonably related to legitimate penological interests." *Turner* v. *Safley*, 482 U.S. 78, 89 (1987). As the Supreme Court recognized in *Bell* v. *Wolfish*, 441 U.S. 520 (1979):

> "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. . . . Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. . . . Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (Footnote omitted; citations omitted.)

*Id.* at 546-547. Given that inmates are placed in the WWSU

because of alleged disciplinary infractions, we conclude that the guard's presence outside the door is "reasonably related to penological interests." See *Lewis* v. *Casey, supra* at 361.

Because Jiles has not shown a constitutionally cognizable actual injury, his objections to the venue in which his communication with counsel took place and the related security detail were properly the subject of summary judgment. Just as the lack of a perfect defense does not deprive a criminal defendant of his or her right to counsel, see, e.g., *Commonwealth* v. *Scheffer*, 43 Mass. App. Ct. 398, 400 (1997), and cases cited, the lack of a perfect setting for attorney-inmate communication does not deny the inmate the right of access of pursuing legal challenges in the courts.

b. *The § 1983 claims.* Counts III, VI, and IX of the complaint are pleaded under the Federal Civil Rights Act, 42 U.S.C. § 1983. Two of these counts, III and VI, are identical in language and both assert § 1983 violations based on the denial of the constitutional right of access to the courts. Because we have concluded in part 1(a) that there was no constitutional violation, these counts also were properly subject to summary judgment.

Jiles's remaining § 1983 claim, pleaded in count IX, is defective because the claim is based on a State statute, G. L. c. 127, 36A. "Relief under 42 U.S.C. § 1983 requires a showing that the defendants denied the plaintiff a constitutional or Federal statutory right and that such denial was effected under color of State law." *Abdullah* v. *Secretary of Pub. Safety*, 42 Mass. App. Ct. 387, 390 (1997).

c. *The MCRA claims.* Counts II, V, and VIII allege violations of the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, § 11I. As with other counts, the core of these counts is that the defendants interfered with Jiles's constitutional right of access to the courts. For the reasons previously stated, we perceive no such constitutional violation. Additionally, the MCRA claims lack an essential element of that law because a plaintiff must demonstrate that interference with the exercise or enjoyment of rights secured by United States Constitution, laws of the United States, the Massachusetts Constitution, or laws of the Commonwealth was effectuated "through threat, intimidation or

coercion." *Deas* v. *Dempsey*, 403 Mass. 468, 470 (1988). See *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158 (1989) (MCRA claim fails because "no actual or potential physical confrontation nor a threat of harm" involved in limiting access to prison library).

d. *Count IV: Right to counsel.* Count IV claims violations of Federal and State constitutional rights to counsel under both the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. However, the right to counsel "attaches only after the filing of criminal charges," *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 856 (2000), and "at every 'critical stage'[6] of the criminal process." *Commonwealth* v. *Trapp*, 423 Mass. 356, 358, cert. denied, 519 U.S. 1045 (1996). There is nothing in the record to establish that, at the time alleged in the complaint, any criminal charges were pending against Jiles or that any critical stage of a criminal proceeding was pending.[7]

e. *Count VII: G. L. c. 127, § 36A.* Count VII alleges a violation of G. L. c. 127, § 36A.[8] Section 36A prohibits the department from abridging or interfering with attorney visitation access to correctional facilities to confer with inmate clients or witnesses. This statutory prohibition is designed to preserve the constitutional right of access to the courts by ensuring that "[i]nmates of correctional institutions are entitled to meet in reasonable circumstances with counsel and prospective counsel." *Hoffer* v. *Commissioner of Correction*, 397 Mass. at 155, citing G. L. c. 127, § 36A. As previously addressed, the record does not demonstrate that the WWSU interview room

---

[6]Such critical stages include trial, see *Gideon* v. *Wainwright*, 372 U.S. 335, 342-344 (1963); custodial police interrogation, see *Escobedo* v. *Illinois*, 378 U.S. 478, 486 (1964); postindictment lineup, see *United States* v. *Wade*, 388 U.S. 218, 236-237 (1967); first appeal, see *Anders* v. *California*, 386 U.S. 738, 742-743 (1967); and probable cause hearing, see *Commonwealth* v. *Donovan*, 392 Mass. 647, 649-651, cert. denied, 469 U.S. 1038 (1984).

[7]Prison disciplinary proceedings are civil, not criminal, in nature. See *Commonwealth* v. *Forte*, 423 Mass. 672, 676 (1996).

[8]G. L. c. 127, § 36A, provides, "The superintendent shall not abridge the right of an inmate of any correctional or penal institution in the commonwealth to confer with any attorney at law engaged or designated by him, and such attorney may visit such inmate at such times as may be established under rules promulgated by the commissioner."

and the related security measure of posting a guard impose unreasonable restraints on attorney access to an inmate or unreasonably interfere with the right of access to the courts.

3. *Conclusion.* Although we determine that there was no constitutional or statutory violation and that summary judgment properly entered, we do not leave this case without commenting on the nature of this prolonged litigation. *Lewis* v. *Casey, supra,* speaks of preserving the constitutional right of access to the courts for the pursuit of "a nonfrivolous legal claim." *Id.* at 352-353 (footnote omitted). This case is an outlier to that concept. From both sides, the resources, time and costs expended in this litigation might have been more profitably directed. From the plaintiff's perspective, it is inexplicable why one answer to this constitutional challenge might not have been that Jiles and his attorney communicate in lower tones to avoid the guard overhearing — a point that bears consideration, because for approximately four years preceding Jiles's complaint, attorneys had conferred with inmate clients in the WWSU interview room without incident. From the department's perspective, on the other hand, there may have been "alternative[s] to the [open grille door] which would fully accommodate the inmates' rights at de minimis cost to valid penological interests," *Cacicio* v. *Secretary of Pub. Safety,* 422 Mass. 764, 770 (1996) — a point that equally bears consideration in light of the fact that other parts of Cedar Junction have different interview room configurations that obviate the objections advanced here.[9] So considered, this case bears the marks of intractable lines being drawn to no avail.

*Judgment affirmed.*

---

[9]The east wing segregation unit and the disciplinary detention unit each have accommodations for attorney-inmate visits, which include doors with no open grille.